Docket No. 104308.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
VICENTE TORRES, Appellee.

*Opinion filed April 17, 2008.*

CHIEF JUSTICE THOMAS delivered the judgment of the court,
with opinion.

Justices Freeman, Fitzgerald, Kilbride, Garman, Karmeier, and
Burke concurred in the judgment and opinion.

## OPINION

Defendant, Vicente Torres, entered a blind plea of guilty to two
counts of first degree murder. The circuit court of Will County
sentenced him to 45 years' imprisonment. Four months after his
sentence was imposed, defendant filed a *pro se* petition under the
Post-Conviction Hearing Act (the Act) (725 ILCS 5/122–1 *et seq.*
(West 2004)), contending that his trial attorney was ineffective for
failing to consult with him about the possibility of filing an appeal. The
trial court denied the petition, ruling that it was frivolous and patently
without merit. The appellate court reversed and remanded the cause
for further proceedings, holding that defendant stated the gist of a
constitutional claim for ineffective assistance of counsel. No.
3–05–0402 (unpublished order under Supreme Court Rule 23). We

granted the State's petition for leave to appeal (210 Ill. 2d R. 315), and we now reverse the appellate court.

## BACKGROUND

On August 9, 2003, police officers responded to a report of a shooting at 350 Hanover Drive in Bolingbrook, Illinois. At the scene, the officers found a woman later identified as Maria Rivera lying on the floor in a pool of blood. She had been shot in the head and was pronounced dead. The wound was caused by a bullet fired from a nine-millimeter handgun.

Two witnesses told police that a man fled the scene by car immediately after the shooting. The witnesses followed the suspect and were able to provide police with his current location. Police gave chase for several miles and finally stopped the suspect's vehicle, apprehending the only person in the vehicle–defendant. The officers' search of the car revealed a nine-millimeter handgun stowed on the floorboard. The weapon was in the "discharge slide back position with a magazine engaged." The two witnesses identified defendant as the person they followed from the scene of the murder.

Defendant was arrested, and an officer fluent in Spanish read defendant his *Miranda* rights and interviewed him in that language. Defendant told police that the victim was his longtime girlfriend. Eight days before the murder, she told him that she was dating somebody else and would not be reuniting with him. Defendant purchased the gun recovered from his vehicle one day before the murder. The next day, he traveled to the victim's residence, hiding the gun in a pair of pants, with the intent of killing the victim. When he arrived and entered the victim's room, she told him to quiet down because she was sleeping, whereupon he replied, "Fine, you can go to sleep forever." Defendant had difficulty pulling the slide of the gun back, allowing the victim to briefly run up some stairs, but as she reached the top of the stairs, defendant fired the gun at her.

An autopsy revealed that the bullet struck the victim in her left temple and exited through her right eye. The forensic testing showed that the gun recovered by police when they apprehended defendant matched the spent cartridge recovered from the scene of the murder.

-2-

Defendant was charged with two counts of first degree murder (720 ILCS 5/9–1(a)(1), (a)(2) (West 2002)). At a plea hearing on April 30, 2004, defendant's public defenders informed the trial court that defendant wanted to enter a blind plea of guilty to both charges. Counsel told the court that they had explained the concept of a blind plea to defendant on multiple occasions. In response to the court's questioning, defendant answered that he was pleading guilty to both counts, that he understood the nature of the charges, and that he understood he had a right to plead not guilty. The State provided a factual basis for the plea, which defendant agreed to, followed by a lengthy inquiry by the trial court to ensure that defendant understood the nature of the proceedings.

The trial court then explained to defendant that the charge carried "a mandatory minimum prison sentence *** of 20 years, and that can go as high as 60 years." "So the range is," the trial court began to repeat, at which point defendant interrupted by stating, "they've already told me that." The trial court then told defendant that it wanted "to make sure that [he] understood all that though." The trial court continued, "so it's a minimum of 20 years in prison and a maximum of 60 years in prison." The trial court then explained that the defendant would have to serve 100% of the sentence. The trial court also explained the difference between a bench trial and a jury trial, and defendant indicated that he understood that he was waiving his right to either kind of trial. In response to further questions from the trial court, defendant agreed that he had fully discussed his decision to plead guilty with his attorneys and that they had explained the consequences of a plea of guilty. He also acknowledged that he was satisfied with the service his attorneys had rendered and that an interpreter had always been present when he spoke with them.

Defendant told the court that he was pleading guilty because his attorneys had told him that he had no defense. One of defendant's attorneys then explained that he and his colleagues had had numerous conversations with defendant, going over the evidence and giving their opinions as to what the ultimate result in the case would be if there was a trial. Defendant again interjected that his attorneys had told him that they "shouldn't fight this because there is no defense for what [he had] done" and he "wanted a trial but his attorneys said no." Defense counsel responded by telling the court that if defendant wanted a trial,

he was willing to try the case. The trial court then instructed defendant on the difference between the public defender's informing a defendant of the strength of his case and telling him how to plead. The court stressed to defendant that nobody could make him plead guilty and that the decision on how to plead was his alone. The court told defendant that if he wanted a trial, he would set the case for a trial.

The trial judge also drew from his former experience as a defense attorney and told defendant the following:

> "When I had your attorney's job of defending people, including in murder cases, I always discussed the evidence with my clients. Most of them wanted opinions on how good I thought their case was, and if I thought it was a good case, I told them so. And if I thought their case was garbage, I told them that, too. There is nothing wrong with your attorneys giving their opinion of the evidence that's against you and the evidence that's in your favor, but the ultimate decision on whether you plead guilty or go to trial is still yours. You decide, not anybody else. You decide."

Following this colloquy, defendant stated three times that he wanted to plead guilty, but the trial court insisted on postponing the plea hearing so defendant could further consider his options and consult with his attorneys.

The trial court conducted a second plea hearing 11 days later, on May 11, 2004. Defense counsel informed the court that defendant was prepared to enter a blind guilty plea. One of defendant's attorneys told the court that he was fluent in Spanish and had spoken to defendant about the plea. In response to questions from the trial court, defendant indicated that he understood the nature of the charges and that he had a right to plead not guilty. The State recited a factual basis for the charges: officers found the victim dead from a gunshot wound to her head; witnesses had followed defendant fleeing the scene in a car and provided details regarding his whereabouts; officers stopped the vehicle, apprehended defendant, and recovered a nine-millimeter handgun from the floorboard; and defendant stated to police that he had purchased the murder weapon, driven to the scene, had difficulty pulling back the slide, and shot the victim in the head as she reached the top of the stairs. Following this recitation, defendant stated that he

-4-

had nothing to add and that if the case went to trial, the evidence would support the State's summary.

The trial court then asked a series of questions designed to ensure that defendant understood the nature of the proceedings and his actions. The court then turned to the sentencing range, explaining that if it accepted the plea of guilty, the range of the sentence that could be imposed was from a minimum of 20 years in prison up to and including 60 years in prison. Defendant stated that he understood. The trial court repeated that the full sentence would be mandatorily served, and that there would be no probation or the possibility of good-time credit. The court asked defendant if he had any questions "about the minimum and maximum sentences prescribed by law for this offense." Defendant said that he did not have any questions.

The trial court next explained how jury trials and bench trials work. Defendant stated that he understood, had no questions, and comprehended that he would have neither kind of trial if he pled guilty. Defendant also indicated that he had discussed his guilty plea with his attorneys, including its consequences, that an interpreter was always present, and that he was satisfied with the performance of his attorneys. The court then asked defendant if "anybody promised [him] anything to get [him] to plead guilty?" "No," defendant said.

On October 29, 2004, the trial court held the first sentencing hearing. The State presented the testimony of seven witnesses, which included four police officers and three of the victim's family members. The defense presented no witnesses, but defendant spoke on his own behalf, telling the court that he was sorry for the harm he had caused his family.

Counsel for both sides made arguments and sentencing recommendations. The State argued that the murder was premeditated and asked for the maximum sentence provided by law. Defense counsel argued that defendant had no prior criminal history, had taken responsibility for the crime, and had pled guilty to save his family "the aggravation of a trial." Defense counsel asked for a sentence "closer to the minimum." The trial court took the arguments under advisement and told the parties it wanted to look at the exhibits and presentence investigation report.

At a hearing 17 days later, the trial court imposed defendant's sentence. The court noted that defendant had taken responsibility for his actions and did not have a prior criminal record. But the court further noted that this was one of the most premeditated first degree murders that it had come across in nearly three decades on the bench. Taking all of these factors into consideration, the trial court sentenced defendant to 45 years' imprisonment.

The trial court then explained to defendant his appeal rights, specifically making sure that he understood that he still had a right to appeal. The court then explained the procedural requirements that defendant would have to satisfy prior to appealing, telling defendant the following:

> "[P]rior to taking an appeal you must file here in the trial court within 30 days a written motion asking to have the trial court reconsider the sentence, or to have the judgment vacated and for leave to withdraw your plea of guilty. If that motion is allowed the sentence will be modified, or the plea of guilty, sentence, and judgment will be vacated, and a trial date will be set on the charges to which the plea of guilty was made. If you are indigent a copy of the transcript of these proceedings *** can be provided to you without costs, and an attorney can be appointed to assist you with the preparation of the motions."

The trial court asked defendant if he understood all of this. Defendant responded, "Yes." The court then asked defendant if he had any questions about anything they had covered. Defendant answered in the negative.

More than two months after he was sentenced, defendant wrote to the circuit clerk, asking whether his trial counsel had filed an appeal on his behalf because after sentencing counsel left without speaking to defendant. The circuit clerk responded by sending defendant a letter informing him that an appeal had not been filed in his case. The clerk included the form for filing a notice of appeal.

Fifty-two days after the clerk mailed the letter, defendant filed a postconviction petition, alleging that he did not understand the consequences of a blind plea. Specifically, defendant alleged that counsel told him he would receive the minimum sentence of 20 years' imprisonment if he pled guilty. He also alleged that "he thinks that his

counsel told him that if he went to trial on this case he would get a longer sentence than if he took the plea agreement" and "this may have been misunderstood in the translation." He also alleged that his counsel did not spend any time with him to make sure he understood the sentence or his options for appeal.

In an accompanying affidavit, defendant reiterated that his attorney left the courtroom after sentencing without speaking to him. Defendant asserted that he was confused as to the reason he received a 45-year sentence. He claimed that if not for the help he was now receiving with his postconviction petition, he would not have known that he had a right to appeal and to have the court reconsider his sentence. Along with his postconviction petition, defendant included a motion to withdraw his guilty plea and to vacate his sentence.

Defendant appeared *pro se* at the hearing set for the first-stage review of his postconviction petition. The trial court found the petition to be frivolous and patently without merit. Accordingly, it summarily dismissed it. The court also found the motion to withdraw the guilty plea to have been filed in an untimely fashion, and the court therefore denied the motion.

The trial court's written order denying the petition specifically found that prior to the guilty plea, defendant was admonished on two separate occasions about the ramifications of a guilty plea pursuant to Supreme Court Rule 402, and both times defendant indicated that he understood his rights, which were explained to him one at a time and in detail. At the April 30, 2004, hearing, defendant stated, without prompting, that his attorneys had already informed him of the sentencing range. At the May 11, 2004, hearing, defendant indicated that no promises had been made to him. Moreover, there is no mention anywhere in the record of a guarantee of a 20-year sentence, and the court instead referred to the sentence as "whatever it might be." Furthermore, the plea hearing was not continued because defendant did not understand his rights, but to afford defendant another opportunity to talk to his attorneys, in spite of defendant's insistence that he would not change his mind and would still plead guilty. Following the guilty plea on May 11, 2004, defendant was properly admonished as to his right to reconsider his sentence, and those admonishments were almost verbatim from Supreme Court Rule 605. Finally, the court noted that defendant always had a court-

appointed interpreter present in court, always had an interpreter present when he talked to his attorneys, and was actually represented by an attorney who was fluent in Spanish.

After reviewing the trial court's written orders with his interpreter, defendant told the court that he had intended to assert in his petition that he was held incommunicado at Stateville and did not have the chance to talk to anyone about filing an appeal. Defendant then added that he "thought" he told his interpreter, before his trial attorney left, that he wanted to appeal, but that the interpreter walked away without paying any attention to him.

The trial court explained to defendant his appeal rights from the denial of his postconviction petition, at which point defendant inquired further about filing an appeal. Defendant also asked that an attorney be appointed on his behalf. The trial court directed the clerk to file a notice of appeal on defendant's behalf and appointed the Appellate Defender to represent defendant on appeal.

A divided appellate court reversed the trial court, holding that defendant stated the gist of a constitutional claim of ineffective assistance of counsel. The appellate court acknowledged that in *Roe v. Flores-Ortega*, 528 U.S. 470, 145 L. Ed. 2d 985, 120 S. Ct. 1029 (2000), the United States Supreme Court rejected a *per se* rule imposing a constitutional obligation on counsel in all cases to discuss the possibility of an appeal with the defendant. The appellate court recognized that the Supreme Court instead held that counsel " 'has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal ***, or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.' " See No. 3–05–0402 (unpublished order under Supreme Court Rule 23), quoting *Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 997, 120 S. Ct. at 1036. The appellate court majority found, however, that "whether a 'rational defendant' would have desired an appeal in the circumstances presented here is irrelevant." Instead, the appellate court majority found that defense counsel must give defendant a meaningful opportunity to express his interest in appealing before leaving the courtroom. No. 3–05–0402 (unpublished order under Supreme Court Rule 23).

Justice Schmidt dissented, asserting that counsel had no constitutional obligation to consult with defendant about an appeal, given the facts of this case. According to the dissent, the majority abandoned the Supreme Court's rejection of a *per se* duty to consult. The dissent found that there was no reason to believe that a rational defendant would want to appeal in this case. Also, despite ample opportunity, defendant did not demonstrate to counsel an interest in appealing, and any claim to the contrary is belied by the record. No. 3–05–0402 (unpublished order under Supreme Court Rule 23) (Schmidt, J., dissenting).

## ANALYSIS

In this appeal, the parties dispute whether defendant's postconviction petition claim–that his attorneys were ineffective for failing to consult with him about an appeal–should have been summarily dismissed by the trial court based on the facts presented by this case.

### I. Standard of Review

The Post-Conviction Hearing Act provides a procedural method by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under either the federal or the state constitution. See 725 ILCS 5/122–1 *et seq.* (West 2004). Proceedings under the Act are commenced by the filing of a petition in the circuit court in which the original proceeding took place. 725 ILCS 5/122–2 (West 2004). Section 122–2 of the Act requires that the petition must, among other things, clearly set forth the respects in which defendant's constitutional rights were violated. 725 ILCS 5/122–2 (West 2004). Section 122–2.1 directs that if the defendant is sentenced to imprisonment (rather than death) and the circuit court determines that the petition is frivolous or patently without merit, it shall be dismissed in a written order. 725 ILCS 5/122–2.1(a)(2) (West 2004).

A postconviction petition is considered frivolous or patently without merit if the petition's allegations, taken as true, fail to present the gist of a constitutional claim. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). Because most petitions are drafted at this stage by

defendants with little legal knowledge, this court views the threshold for survival as low (*Delton*, 227 Ill. 2d at 254), requiring only a limited amount of detail in the petition (*People v. Jones*, 211 Ill. 2d 140, 144 (2004)). But nonfactual and nonspecific assertions that merely amount to conclusions are not sufficient to require a hearing under the Act. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). Moreover, this court has consistently upheld the dismissal of a postconviction petition when the allegations are contradicted by the record from the original trial proceedings. *Coleman*, 183 Ill. 2d at 381-82. To determine whether a petition is frivolous or patently without merit, the circuit court examines the petition independently without input from the parties. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). Our review of a dismissal of a postconviction petition is *de novo*. *Coleman*, 183 Ill. 2d at 389.

## II. Ineffective Assistance of Counsel

Generally, claims of ineffective assistance of counsel are governed by the now-familiar test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). That test requires a defendant claiming ineffective assistance to show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In *Flores-Ortega*, the Supreme Court extended *Strickland* to claims of ineffective assistance based on a defense counsel's failure to file a notice of appeal. *Flores-Ortega*, 528 U.S. at 476-77, 145 L. Ed. 2d at 994-95, 120 S. Ct. at 1034. For the reasons that follow, we find that defendant failed to satisfy the first prong of *Strickland*, and thus we need not consider the second prong of whether defendant was prejudiced.

## A. "Reasonableness" Standard

With respect to the "reasonableness" prong of *Strickland*, *Flores-Ortega* rejected a bright-line rule that counsel must always consult with a defendant regarding an appeal. *Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 996-97, 120 S. Ct. at 1036. The Court noted that

such a rule would be inconsistent with both *Strickland* and common sense, citing two hypotheticals:

> "For example, suppose that a defendant consults with counsel; counsel advises the defendant that a guilty plea probably will lead to a 2 year sentence; the defendant expresses satisfaction and pleads guilty; the court sentences the defendant to 2 years' imprisonment as expected and informs the defendant of his appeal rights; the defendant does not express any interest in appealing, and counsel concludes that there are no nonfrivolous grounds for appeal. Under these circumstances, it would be difficult to say that counsel is 'professionally unreasonable,' [citation], as a constitutional matter, in not consulting with such a defendant regarding an appeal. Or, for example, suppose a sentencing court's instructions to a defendant about his appeal rights in a particular case are so clear and informative as to substitute for counsel's duty to consult. In some cases, counsel might then reasonably decide that he need not repeat that information." *Flores-Ortega*, 528 U.S. at 479-80, 145 L. Ed. 2d at 996, 120 S. Ct. at 1036.

### 1. "Rational Defendant" Prong of *Flores-Ortega* Test
#### a. Alleged Promise of a 20-year Sentence

Here, defendant does not allege that he instructed counsel to file an appeal or that counsel discussed an appeal with him. Rather, defendant alleges, and it is undisputed, that counsel failed to consult with him about an appeal. *Flores-Ortega* held that in such cases counsel has a constitutionally imposed duty to consult with a defendant about the possibility of an appeal "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 997, 120 S. Ct. at 1036. We now examine these two parts of the *Flores-Ortega* test and apply them to the facts before us.

The first part of the test indicates there is reason to think that a rational defendant would want to appeal if nonfrivolous grounds for an appeal exist. We are not aware of any nonfrivolous grounds in the

instant case. The crux of defendant's postconviction petition alleged that defendant did not understand the consequences of entering a blind plea of guilty and his counsel had promised him that he would receive the minimum sentence of 20 years' imprisonment if he pled guilty. Defendant has now abandoned this claim and does not argue it in his brief before this court as a nonfrivolous ground for appeal. This is probably because the claim is belied by the record of the guilty-plea proceeding and is therefore frivolous and patently without merit.

It is well settled that a defendant's acknowledgment in open court, at a plea hearing, that there were no agreements or promises regarding his plea serves to contradict a postconviction assertion that he pled guilty in reliance upon an alleged, undisclosed promise by defense counsel regarding sentencing. *People v. Greer*, 212 Ill. 2d 192, 211 (2004); *People v. Rissley*, 206 Ill. 2d 403, 454 (2003) (defendant's allegations were "totally contradicted by the record of the plea"); *People v. Jones*, 144 Ill. 2d 242, 263 (1991); *People v. Maury*, 287 Ill. App. 3d 77, 83 (1997) (record indicated that defendant answered "no" when the circuit court inquired whether any extraneous promises had been made to him). In *Greer*, the defendant claimed that his counsel told him that he had reached an agreement on a 45-year sentence. The defendant further claimed he pled guilty in reliance on his counsel's representations, but was instead sentenced to a 60-year term of imprisonment. This court concluded in *Greer* that the record itself demonstrated that the defendant's postconviction allegations were patently without merit and frivolous because the defendant had responded in the negative in open court when asked whether any promises had been made in connection with his plea. *Greer*, 212 Ill. 2d at 211.

Similarly, defendant in this case was asked by the trial court at the plea hearing whether any promises had been made to cause him to enter his plea of guilty, and defendant responded, "No." The record also shows that defendant was repeatedly admonished by the trial court that the maximum sentence that it might impose could be as high as 60 years. Defendant always indicated that he understood this when asked. Thus, defendant's own words refute his postconviction allegations. Defendant's postconviction allegations are also contradicted by his own counsel's sentencing recommendation in open

-12-

court, which merely requested a sentence "closer to the minimum," not the minimum sentence.

### b. Imperfect Admonishment as to the Minimum Sentence

Defendant argues for the first time before this court that he has a nonfrivolous ground for appeal because the trial court incorrectly admonished him about the possible minimum sentence and his trial attorney should have known that he was incorrectly admonished. The trial court admonished him in accordance with section 5–8–1 (a)(1)(a) of the Unified Code of Corrections (the Code), which provides that the sentence of imprisonment for first degree murder shall be for a term of "not less than 20 years and not more than 60 years." See 730 ILCS 5/5–8–1(a)(1)(a) (West 2004). Defendant correctly notes, however, that the statutory minimum sentence available in this case was actually 45 years because section 5–8–1(a)(1)(d)(iii) of the Code provides that 25 years of imprisonment be added to the sentence if, during the commission of the offense, defendant personally discharged a firearm that caused the death of another person. See 730 ILCS 5/5–8–1(a)(1)(d)(iii) (West 2004). Relying on *People v. Davis*, 145 Ill. 2d 240, 250 (1991), defendant argues that the failure of the trial court to properly admonish a guilty-plea defendant as to the correct, minimum sentence is grounds for vacating the guilty plea. Defendant acknowledges that he could not have negotiated a lesser sentence given that the 45-year sentence he received was the minimum possible under the sentencing scheme. But he contends that the decision to forgo an appeal belonged to him and not his counsel, citing four federal cases where guilty pleas were vacated because the defendants either were not informed of the correct minimum sentence or were not informed of the applicability of sentencing enhancements. See *United States v. Fernandez*, 205 F.3d 1020 (7th Cir. 2000); *United States v. Goins*, 51 F.3d 400 (4th Cir. 1995); *United States v. Watch*, 7 F.3d 422 (5th Cir. 1993); *United States v. Hourihan*, 936 F.2d 508 (11th Cir. 1991).

Initially, we note that to the extent that defendant would now attempt to raise the admonishment issue as an independent claim apart from the duty-to-consult issue, it would be forfeited because the admonishment issue was not raised in defendant's postconviction petition, nor was it raised in the appellate court. See *People v.*

*Pendleton*, 223 Ill. 2d 458, 475 (2006); *People v. Jones*, 211 Ill. 2d 140, 148 (2004). Thus, we consider defendant's admonishment claim only in the context of the *Flores-Ortega* framework of whether it amounts to a nonfrivolous ground for appeal that a rational defendant would have wanted to raise under the circumstances. We find that it is not, and that the issue is frivolous and without merit.

Whether reversal is required for an imperfect admonishment depends on whether real justice has been denied or whether defendant has been prejudiced by the inadequate admonishment. *Davis*, 145 Ill. 2d at 250. In this case, it is undisputed that the trial court never applied the 25-year enhancement.[1] During the trial court proceedings, the parties and the court understood the sentencing range to be 20 to 60 years' imprisonment. Defendant was then sentenced exactly as his admonishments advised him he would be. This crucial fact makes all of the authority relied upon by defendant fatally distinguishable. In each case defendant cites, the defendants were told one thing and subjected to another at sentencing.

For example, in *Davis*, the trial court's admonishment prior to taking the guilty plea led the defendant to believe that he would be eligible for probation under the Treatment Alternatives to Street Crime (TASC) program. Sometime during the 51 days between the date the guilty plea was entered and the date the defendant's sentence was imposed, defense counsel discovered that the defendant was not eligible for TASC probation. Defense counsel brought this to the attention of the trial court by way of a motion for a continuance and later with a motion to vacate the guilty plea on the grounds that the purpose of the plea–to request TASC probation–had been frustrated.

---

[1]Even though the court did not apply the enhancement, the sentence is not void because it is still within the lawful statutory range. With the 25-year enhancement, the sentencing range for first degree murder, during which the defendant discharged a firearm that caused the death of another person, was 45 to 85 years. See 730 ILCS 5/5–8–1(a)(1)(a), (a)(1)(d)(iii) (West 2004). Defendant's sentence was within this range, so it conforms to the statutory requirements and is therefore not void. See *People v. Brown*, 225 Ill. 2d 188, 205 (2007) (a sentence not authorized by statute is void only to the extent that it exceeds what the law permits; the legally authorized portion remains valid).

The trial court denied both motions and imposed a 10-year prison sentence. This court found that the defendant's motion to vacate the guilty plea should have been granted. *Davis*, 145 Ill. 2d at 250-51.

In *Fernandez*, defense counsel told the defendant and the trial judge in open court at a plea hearing that the minimum sentence was 70 months. The judge did not inform the defendant prior to his plea that the statutorily mandated minimum sentence was actually 10 years. Instead, the judge accepted defendant's guilty plea and then later sentenced him based on the understanding that the minimum sentence was 10 years, not 70 months. In *Watch*, the district court allowed the defendant to be admonished that the applicable sentencing range was between "zero and the statutory maximum of 20 [years]." But at sentencing, the court found that a mandatory minimum sentence of 110 months' imprisonment applied. The court then sentenced him within that range to 120 months. *Watch*, 7 F.3d at 425.

In contrast to the above-mentioned cases, the trial court in this case sentenced defendant exactly as he had been admonished. The court informed defendant that he would be sentenced to between 20 and 60 years, and the court selected 45 years from within this range based on the extreme premeditation of the murder, which was mitigated by defendant's lack of a criminal history. Defendant essentially argues that the trial court should have added 25 years to his sentence, making his sentence 70 years, and because the court should have added 25 years, it should have admonished defendant that it would add 25 years to the 20- to 60-year sentencing range. Given that the trial court did not add or even consider the 25 years that defendant complains about, we find no merit to defendant's argument.

## c. No Reason to Think a Rational Defendant Would Want Appeal

*Flores-Ortega* directs that, in considering whether counsel had a duty to consult about an appeal, " 'a highly relevant factor *** will be whether the conviction follows a *** guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings.' " *United States v. Taylor*, 339 F.3d 973, 980 (D.C. Cir. 2003), quoting *Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 997, 120 S. Ct. at 1036. Here, defendant did plead guilty and that plea did

-15-

in fact reduce the scope of potentially appealable issues–to the degree that defendant had nothing left other than the frivolous claims discussed above. See *Taylor*, 339 F.3d at 980. It is also clear that defendant sought an end to the judicial proceedings by pleading guilty. As the defense explained at the sentencing hearing, defendant pled guilty to save his family "the aggravation of a trial." Defendant also admitted that his attorneys had no defense for him to mount against the charges, and the facts in the record easily confirm that this is an accurate assessment.

*Flores-Ortega* further provides that " '[e]ven in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights.' " *Taylor*, 339 F.3d at 980, quoting *Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 997, 120 S. Ct. at 1036. As to the first factor, defendant did in fact receive the sentence that he bargained for. The trial court repeatedly informed him that it would impose a sentence between 20 and 60 years. Defendant always indicated that he understood this. When defendant "said that he understood and wanted to plead guilty nonetheless, he accepted the possibility–as part of the 'sentence bargained for'–that the court's [sentencing determination] would differ" from any predictions his lawyers may have made about how lenient the court's determination would be. See *Taylor*, 339 F.3d at 981. The second factor is also unavailing to defendant because, even though defendant did not waive the right to appeal his sentence, he had no nonfrivolous ground upon which to base any such appeal. See *Taylor*, 339 F.3d at 980.

Accordingly, we conclude that defendant has not established any ground that would have given his trial counsel "reason to think *** that a rational defendant would want to appeal" the sentence imposed in this case. *Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 997, 120 S. Ct. at 1036. Thus, defendant cannot meet the first part of the *Flores-Ortega* test.

### 2. "Interested in Appealing" Prong of *Flores-Ortega* Test

The second part of the test requires us to determine whether "there is reason to think *** that this particular defendant reasonably

demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 997, 120 S. Ct. at 1036. "In making this determination, we 'must take into account all the information counsel knew or should have known.' " *Taylor*, 339 F.3d at 980, quoting *Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 997, 120 S. Ct. at 1036.

One thing that defendant's counsel knew was that their client had pled guilty and had expressly indicated that he sought an end to the judicial proceedings. Counsel also knew that the evidence against their client was beyond overwhelming, leaving no serious grounds for a trial defense on the issue of guilt. Moreover, even if defendant's postconviction allegations could be liberally construed to indicate that prior to his guilty plea, defense counsel expressed to him that they thought the trial court would impose a more lenient sentence than 45 years, this still does not help defendant's cause where the record indisputably shows that the court advised him that his sentence could be as high as 60 years and he indicated he understood this. Defendant was also meticulously admonished by the trial court about his appeal rights. Defendant indicated that he understood those rights, but expressed no intention to the court of any desire to appeal nor did he express any displeasure with his sentence. It is also undisputed that defendant had no conversation with his counsel following imposition of the sentence. Finally, we note that even if defendant was displeased with his sentence, he actually received the minimum sentence allowed by law and so any challenge to his sentence on the ground that it was excessive would be without merit at this point. Under these circumstances, there was simply no reason for defendant's lawyers to think that defendant was dissatisfied or would want to appeal. Accordingly, we conclude that "this particular defendant did not "reasonably demonstrate[ ] to counsel that he was interested in appealing" (*Flores-Ortega*, 528 U.S. at 480, 145 L. Ed. 2d at 997, 120 S. Ct. at 1036), and he is thus unable to satisfy the second part of the *Flores-Ortega* test.

## CONCLUSION

Finally, we believe that the "better practice" is for counsel to consult with his client about the possibility of an appeal following the imposition of a sentence imposed upon a plea of guilty, and we exhort

all defense counsel practicing in our state courts to follow this practice. *Flores-Ortega*, 528 U.S. at 479, 145 L. Ed. 2d at 996, 120 S. Ct. at 1035; see also *Taylor*, 339 F.3d at 982. The Supreme Court has made clear, however, that such consultation is not constitutionally required in all cases, and this case is one in which there was no constitutionally mandated duty to consult. Thus, we hold that the circuit court properly dismissed defendant's postconviction petition.

For the foregoing reasons, we reverse the judgment of the appellate court and we affirm the judgment of the circuit court.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

-18-